UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 06 CR 660 |
| v. | ) | Judge Joan B. Gottschall |
| ASHLEY COLIN ASKEW-BELL, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a motion to suppress filed by the defendant, Ashley Colin Askew-Bell ("Askew-Bell"), on January 31, 2007. The government responded on February 14, 2007, and Askew-Bell filed her reply on February 21, 2007. The court held an evidentiary hearing on the motion on March 6, 2007. At the conclusion of that hearing, Askew-Bell requested the opportunity to file additional briefing. The court instructed both Askew-Bell and the government to file cross-briefs. Briefing was completed on March 19, 2007. The parties argued before the court on March 21, 2007. For the reasons set forth below, the motion to suppress is denied.

**I. BACKGROUND**

During the summer of 2006, three banks located within a mile of each other near the Howard Street border between Chicago and Evanston, Illinois, were robbed. On July 22, 2006, a Greater Bank located at the intersection of Howard and California streets, was robbed by an unidentified woman described by local authorities as a black female who wore sunglasses and a white top. Descriptions of the suspect also indicated that she was

1

heavy-set and possibly pregnant. Suppression Hearing Transcript ("Tr.") 9. A photograph of the suspect taken by the bank's surveillance camera additionally revealed that she wore black pants and carried her purse high up underneath her arm. Gov't Ex. 1. After receiving a dispatch describing the suspect, Officer Ralph Mieszala, an Evanston police officer, went to the crime scene and was given a photocopy of a photograph of the suspect taken by the bank's surveillance camera.

On August 25, 2006, a Charter One Bank located on the Evanston side of Howard Street was robbed by an unidentified black heavy-set female. A day or two after the robbery, Officer Mieszala spoke with the detectives investigating the robbery. He reviewed footage of the bank's surveillance cameras, which had taken pictures of the bank robbery suspect. These were color photographs. They depicted a heavy-set black female wearing sunglasses similar to those worn by the suspect from the July 22nd robbery and carrying a similar purse.[1] Officer Mieszala took a photocopy of one of the images he viewed to keep with him on his clipboard. He kept this with the photocopy of a surveillance picture from the July 22 robbery. The bank robber had threatened the use of a gun during both robberies. Tr. 26.

On September 8, 2006, Officer Mieszala was on routine patrol in the area in which the robbed banks were located when he spotted Askew-Bell, a woman who matched the description of, and bore a strong resemblance to, the bank robbery suspect. Specifically, Askew-Bell, a black female who at the time was visibly pregnant, was seen wearing a white top, black pants, sunglasses similar to those worn by the suspect, and

---

[1] Officer Mieszala testified that based on the photographs, he and the detectives working on the case had determined that the two banks were very likely robbed by the same woman. Tr. 19-20. Based on a description of the suspect who had robbed a third nearby bank, Officer Mieszala believed the same person was responsible for the third robbery as well but he did not receive photographs of the person suspected of robbing that bank.

carrying a purse in the same manner as the suspect. At the suppression hearing, Officer Mieszala testified that Askew-Bell was a "dead ringer" for the suspect. Tr. 26.

> *Q*: Did the person that you saw when you were driving eastbound resemble anyone that you had seen before?
> *Officer Mieszala*: Yes. I mean, when I was driving and then, you know, I saw her, I mean, that was – it was like I was looking at this photo –
> *Q*: Who did that person look like?
> *Officer Mieszala*: – of the robbery from the Chicago bank on July 22, the one that –
> *Q*: How close of a resemblance would you say it was?
> *Officer Mieszala*: Very close. I mean, you know, as far as color of the clothing, the sunglasses, the way she carried her purse, I mean, it was like a slap in the face. It was like wow. There was no hesitation.

Tr. 24. Askew-Bell was walking westbound on Howard Street. After circling around the block a couple of times and re-checking the pictures he had with him, he got out of his car and approached Askew-Bell.

Officer Mieszala told Askew-Bell that she looked like someone the police were looking for and asked to see some identification. Officer Mieszala testified that he wanted to get her name so he could run it through the computer. Tr. 32, 90. Askew-Bell responded that she had no identification with her. Officer Mieszala testified that he thought it odd that she did not have identification. Tr. 29. Officer Mieszala then asked her for her name. She responded that it was "Bertha Sharp." When Officer Mieszala asked Askew-Bell to spell her name, she twice spelled it "S-H-R-P." She then corrected herself, spelling it "S-H-A-R-P." Officer Mieszala testified that at this point he believed Askew-Bell was giving him a false name. Tr. 30. He then asked her for her date of birth and address. After responding that she lived on Ridge and Chicago and that her date of birth was April 1, 1985, Askew-Bell stated that she had to go to the bathroom.

3

Officer Mieszala, who had not yet been able to run the name "Bertha Sharp" on the computer, told Askew-Bell that he would accompany her to the bathroom. The officer and Askew-Bell walked back to Dobson Plaza, a building Officer Mieszala had seen Askew-Bell exiting shortly before his encounter with her. As Askew-Bell was about to enter the bathroom, Officer Mieszala grabbed the purse from her shoulder and held it. Officer Mieszala testified he did this because he thought she might have a gun in her purse and because he was worried about her escaping through a window in the restroom.

> *Officer Mieszala*: Well, we went in, turned the corner in the corridor, turned to the right, and she was going to go in, and then it just – my thought was I probably shouldn't let her go in the bathroom, at least, you know, alone or something. If she's got a gun in the purse or something, I said, my first impression was she comes out and starts shooting old people in wheelchairs, that's not going to – I was a little concerned, you know, that if I was dealing with the real suspect here, that could present problems. Plus I didn't know the layout of the Dobson Plaza, if that was an exterior wall where she could go out and – I figured she's not telling me her true name, and if there is a window or something on an exterior wall that she could go out of, there is not way I could go in with her.

Tr. 32-33. Askew-Bell told Officer Mieszala that she needed the purse. Officer Mieszala responded that she did not need the purse to use the bathroom. Askew-Bell then stated that she needed a tampon from her purse. Officer Mieszala testified that he thought this was strange since Askew-Bell was visibly pregnant. He refused to give her the purse. Askew-Bell next said she needed some pills from the purse.

Officer Mieszala testified that at this point, he had become uncomfortable with the progression of events and did not think Askew-Bell should go into the bathroom alone. Tr. 35. He asked her to accompany him to the front of the building. Officer Mieszala testified he did this so he could get a female officer to search Askew-Bell and her purse. *Id.*

As Officer Mieszala and Askew-Bell were walking to the front of the Dobson Plaza, Askew-Bell turned and ran back into the plaza and out a side emergency exit. Officer Mieszala chased after her and called his dispatch to say a subject matching the description of a bank robber was fleeing from Dobson Plaza. Askew-Bell was apprehended by Officer Rust on the grass in front of Dobson Plaza. As Officer Rust was handcuffing Askew-Bell, Officer Mieszala dumped the contents of the handbag out on the grass beside her.

Inside the purse was Askew-Bell's school identification card, which bore her photograph and identified her as being Ashley Askew-Bell. Since the card did not contain a date of birth, Officer Mieszala opened up her wallet and saw part of a handwritten note stating "I have a gun." Officer Rust then transported Askew-Bell to the police station.

At the police station, further inspection of the purse revealed a ten-dollar bill and an Illinois driver's license that appeared to have red ink on them. The note Officer Mieszala had spotted earlier read in full, "I have a gun and will shoot! Put the money on the counter and let me leave and nobody gets hurt." Def.'s Initial Mem. Ex. A.

Askew-Bell argues that Officer Mieszala's actions violated the Fourth Amendment in the following ways: 1) Officer Mieszala's initial approach of Askew-Bell constituted a *Terry* stop for which he did not have proper justification; 2) Officer Mieszala's subsequent detention of Askew-Bell and seizure of Askew-Bell's purse escalated the encounter to a de facto arrest requiring probable cause, which he did not have; 3) Officer Mieszala's search of Askew-Bell's purse and wallet was a search that required probable cause, which Officer Mieszala did not have. Therefore, Askew-Bell

seeks to have the court suppress the evidence found in her purse and wallet. The court considers each argument in turn below.

## II. ANALYSIS

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. Amend. IV. The Seventh Circuit has repeatedly recognized three types of police-citizen encounters: a consensual encounter, an investigatory stop, and an arrest. *See United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir. 1989); *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982).

No justification is required for a consensual encounter where an officer requests a citizen's identification. It is well established that an officer seeking a citizen's voluntary cooperation through non-coercive questioning involves no legally cognizable restraint on the citizen's liberty and is therefore not a seizure within the meaning of the Fourth Amendment. *United States v. Noble*, 69 F.3d 172, 180 (7th Cir. 1995); *Teslim*, 869 F.2d at 321 (a consensual encounter "is that in which no restraint of the liberty of the citizen is implicated, but the voluntary cooperation of the citizen is elicited through non-coercive questioning"); *United States v. Rodriguez*, 69 F.3d 136, 142 (7th Cir. 1995) ("the mere request for and voluntary production of [identification] does not constitute a seizure, but rather falls into the category of a non-coercive police-citizen encounter.").

The next type of encounter, an investigatory stop (or what is commonly referred to as a *Terry* stop) does require justification. Following the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 24 (1968), "an officer may conduct a brief, non-intrusive detention of a person if the officer has specific and articulable facts sufficient to give rise

to a reasonable suspicion that a person has committed or is committing a crime." *Scheets*, 188 F.3d at 837. The Seventh Circuit recently noted that "[w]hile 'reasonable suspicion' is a hard term to define precisely, the Supreme Court has held that it is a commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 695 (1996)).

Finally, an arrest, which "is characterized by highly intrusive or lengthy search or detention," must be based on probable cause to believe that a person has committed or is committing a crime. *Black*, 675 F.2d at 133. When actions by the police exceed the bounds permitted by reasonable suspicion, the seizure becomes an arrest and must be supported by probable cause. *Florida v. Royer*, 460 U.S. 491, 506 (1983) (*Terry* stop turned into a de facto arrest without probable cause when suspected drug courier was questioned in an airport and taken to a small police office where the suspect consented to a search of his luggage after police retrieved luggage from airline).

Though the lines between consensual encounters, *Terry* stops, and arrests have become increasingly blurred over the years, police conduct is judged in terms of what the officer did rather than what he or she may have called it or thought of it at the time. In *Peters v. New York*, for example, the Supreme Court approved the proposition that if an officer perceives his conduct as a mere stop, but he makes a full search of the person rather than a mere frisk, the evidence found is admissible only if the officer had probable cause to arrest the person. 392 U.S. 40, 66 (1968) (decided with *Sibron v. New York*, 392 U.S. 40, 66 (1968)).

The court concludes that the interaction between Officer Mieszala and Askew-Bell began as a consensual encounter that escalated into an investigatory stop and then culminated in an arrest. At each step, an escalation was caused by Askew-Bell's actions. As discussed below, the events, as they progressed, continued to give rise to heightened suspicion, providing the necessary justification for Officer Mieszala's actions.

    A. *Officer Mieszala's Request for Identification and Subsequent Detention Did Not Violate the Fourth Amendment.*

The parties disagree over the exact moment in time that Officer Mieszala's actions required justification. Askew-Bell, relying largely on Officer Mieszala's characterization of his action as a "street stop" in his report, argues that Officer Mieszala's initial approach constituted a *Terry* stop for which he did not have adequate justification. The government contends the initial encounter was consensual, therefore not requiring justification. Although Officer Mieszala had reasonable suspicion to conduct a *Terry* stop at the moment he saw Askew-Bell, the court finds his initial encounter with her was a consensual encounter rather than a seizure, which, due to the suspicious nature of Askew-Bell's response, ripened into a justifiable *Terry* stop.

    1. <u>A Request for Identification Does Not Constitute a Seizure.</u>

Officer Mieszala approached Askew-Bell on the street and asked her for identification. Askew-Bell responded that she had no identification but offered that her name was "Bertha Sharp." Officer Mieszala did not frisk Askew-Bell, draw his weapon, touch her or ask her to accompany him to a different location. At this point she was not "seized" within the meaning of the Fourth Amendment; a person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person [in the

subject's position] would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Generally, courts draw the line between consensual encounters and *Terry* stops at the point when an officer uses his authority as an officer to do something an ordinary citizen would not be able to do. In *Scheets*, the Seventh Circuit articulated the following commonly considered factors: "whether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance." 188 F.3d at 836-37.

Officer Mieszala did not do anything that would have indicated to a reasonable person that she was not free to leave. Indeed, Askew-Bell presumably felt she *could* leave since she said she needed to use the bathroom. *See Tom v. Voida*, 963 F.2d 952, 957 (7th Cir. 1992) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)) ("A seizure requires not only that the reasonable person feel unfree to leave, but also that the subject actually yield to a show of authority from the police or be physically touched by the police.").

It was only when Officer Mieszala responded to her statement that she had to go to the bathroom by stating that he would accompany her that a reasonable person would have believed she was not free to leave. The fact that Officer Mieszala described his actions as a "street stop" in his report does not convert his behavior into a seizure without more.

9

## 2. Officer Mieszala Had Reasonable Suspicion to Stop Askew-Bell

Assuming *arguendo* that Officer Mieszala's initial encounter with Askew-Bell was a *Terry* stop, he had a particularized and objective basis for stopping her to request identification: a suspicion that Askew-Bell was the unidentified bank robber based on the photographs and her location. Investigatory detentions are valid if reasonable suspicion objectively exists. "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Lawshea*, 461 F.3d at 859. Reasonable suspicion can be based on information or descriptions received directly through police communication channels. *See United States v. Hensley*, 469 U.S. 221, 232 (1985) (finding reasonable suspicion based on information contained in a wanted flyer, even where the suspected criminal activity had been completed).

The factors that informed Officer Mieszala's decision to approach Askew-Bell were: 1) the extent to which she matched a description of the suspect from the July 22, 2006, robbery, and resembled the person in a photograph of the suspect taken during the course of that robbery; 2) the extent to which she resembled the suspect from the August 25, 2006, robbery, as photographed in color by the surveillance cameras, and a photocopy of one of those photographs; 3) her presence in the area in which the robbed banks were located[2] and 4) her pregnancy.[3]

---

[2] Officer Mieszala testified that the proximity of the banks to each other led him to believe the suspect either lived in the area or frequented it. Tr. 21.
[3] Officer Mieszala was told that the description of the suspect as "heavyset" may have been due to pregnancy. Tr. 9.

10

Officer Mieszala testified that when he saw her, he thought she was a "dead ringer" for the suspect. Tr. 26. She was wearing clothing that resembled that of the bank robbery suspect, had similar sunglasses and a similar purse, which she was carrying in a manner that resembled the way the suspect carried her purse. She was also visibly pregnant. Taken together with the fact that Officer Mieszala spotted Askew-Bell in the neighborhood in which the crimes had taken place, these circumstances created reasonable suspicion that Askew-Bell was the bank robbery suspect, thereby justifying Officer Mieszala's request for identification. *See United States v. Lawes*, 292 F.3d 123, 127 (2d Cir. 2002) (upholding finding of reasonable suspicion of person based on similarity to mugshot notwithstanding some differences in the description between the suspect and defendant); *United States v. Barnes,* 910 F.2d 1342, 1344-45 (6th Cir. 1990) (reasonable suspicion based on resemblance to mug shot and presence in location where suspect was known to congregate); *c.f. United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (noting that recognition of a suspect based on surveillance photographs may be sufficient alone to establish probable cause); *Shriner v. Wainwright*, 715 F.2d 1452 (11th Cir. 1983) (man's "striking resemblance" to robbery suspect plus his proximity in time and place to the scene of the crime gave police probable cause to arrest him).

Though defense counsel has attempted to paint the descriptions as generic and unremarkable, rendering Officer Mieszala's belief to be nothing more than a "hunch," there is a difference between a hunch based on something and a hunch based on nothing. As detailed above, Officer Mieszala's belief that Askew-Bell strongly resembled the bank robbery suspect, to the extent it can be characterized as a "hunch," was hardly based on nothing. Furthermore, this argument ignores all of the other circumstances upon which

Officer Mieszala's suspicion was based. Thus, even if the initial encounter between Officer Mieszala and Askew-Bell constituted a *Terry* stop, the stop was justified and therefore valid.

### 3. Officer Mieszala Had Reasonable Suspicion to Justify Accompanying Askew-Bell to the Bathroom.

After telling Officer Mieszala that she did not have identification, Askew-Bell told him her name was "Bertha Sharp," a name that seemed to be an alias, based on her inability to spell it. Officer Mieszala believed Askew-Bell was not telling him her real name and that her request to go to the bathroom was evasive. Tr. 30-31, 33.

Askew-Bell's request frustrated Officer Mieszala's inquiry into her identity. *See Houston v. Does*, 174 F.3d 809, 815 (6th Cir. 1999) ("When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate."). Officer Mieszala had not yet had a chance to run the name "Bertha Sharp" in the computer. Askew-Bell's problem spelling her putative name and her insistence on stopping Officer Mieszala's inquiry, added enough to what he already knew to justify a continued detention. Therefore, Officer Mieszala was justified in accompanying Askew-Bell to the bathroom, telling her he would not "detain" her for very long.

### B. Officer Mieszala's Seizure of Askew-Bell's Purse Did Not Violate the Fourth Amendment.

Having found that Officer Meiszala was justified in making a *Terry* stop, regardless of whether that stop began at the time of his initial approach or at the time he accompanied Askew-Bell to the bathroom, the court must next examine whether the ongoing detention was reasonably related in scope to the circumstances which justified

the interference in the first place. *See Royer*, 460 U.S. at 500 ("The scope of the detention must be carefully tailored to its underlying justification."); *United States v. Askew*, 403 F.3d 496, 508 (7th Cir. 2005) (finding that the FBI executed a constitutional *Terry* stop–not an arrest–in a parking lot, even though the agents blockaded defendant's car and approached with guns drawn). The Supreme Court has declined to establish a "bright-line" rule to determine when an investigatory detention becomes an arrest. "Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a de facto arrest." *United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994).

This standard requires the court to evaluate Officer Mieszala's seizure of Askew-Bell's purse as she walked into the bathroom, including his subsequent refusal to return it. Officer Mieszala testified that his on-the-spot decision to grab Askew-Bell's purse was motivated by two reasons. First, he was concerned about the possibility that it might contain a gun. *See* Tr. 32-33 ("[M]y first impression was she comes out and starts shooting old people in wheelchairs, that's not going to–I was a little concerned, you know, that if I was dealing with the real suspect here, that could present problems.") Second, he did not know the layout of Dobson Plaza and was concerned she would try to escape from the bathroom. Tr. 33.

Immediately after Officer Mieszala grabbed Askew-Bell's purse, she turned around and asked him to return it. When Officer Mieszala told Askew-Bell she did not need her purse to go to the bathroom, she replied that she needed a tampon. Seeing that she was visibly pregnant, Officer Mieszala declined this request. Then Askew-Bell told him that she needed some pills from the purse. At this point, Officer Mieszala testified

13

he "did not feel easy." Tr. 35.  He determined she should not be left alone.  Officer Mieszala's refusal to return the purse and request that Askew-Bell accompany him to the front of the plaza so he could call a female officer to search her and the purse, was based on, in addition to all the circumstances discussed above, the additional suspicion that arose from Askew-Bell's unusual behavior.

Officer Mieszala's spur of the moment decision to hold Askew-Bell's purse while she used the bathroom was reasonable.  There is no reason to believe that if Askew-Bell went to the bathroom and returned, Officer Mieszala would have searched the purse.  Nor was his refusal to return it, given Askew-Bell's shifting explanations for needing it, unreasonable.

Askew-Bell contends that at that point the encounter evolved from a *Terry* stop into a formal arrest that lacked probable cause.  This argument is unavailing.  First, officers are entitled to use reasonable means to effectuate an investigatory stop without transforming the stop into an arrest.  *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993).  One of the ways the police might ensure compliance with their request for a person to stop is to cut off other avenues of escape.  *United States v. Felix-Felix*, 275 F.3d 627, 636 (7th Cir. 2001) (holding that a stop did not become an arrest when police "cornered" suspect in a dead end).  Further, the court must consider the suspect's own actions in frustrating the legitimate efforts of police to stop and question her.  *Id.* (holding that police actions did not amount to arrest, in part because the "circumstances were largely of [the suspect's] own making").  Second, officers are entitled to use reasonable means during a *Terry* stop to dissipate danger.  "The rule of minimal intrusion permits whatever efforts are necessary to neutralize a potentially explosive and fatal situation."

*United States v. Barlin*, 686 F.2d 81, 87 (2d Cir. 1982). Often these means involve the use of force. When determining the reasonableness of the use of force, courts balance the degree of intrusion on the individual's liberty against the state's need to ensure the safety of both the public and law enforcement officers. *See Tilmon*, 19 F.3d at 1225 (citing *Terry*, 392 U.S. at 19-20) (holding that investigatory stop of bank robbery suspect's car was not transformed into arrest when car was completely surrounded by police vehicles, police drew their weapons, suspect was ordered to get out of car and to lie prone on ground, and suspect was placed in handcuffs).

With these considerations in mind, the court finds that Officer Mieszala's actions were motivated by legitimate *Terry* objectives. Those actions were no more intrusive than necessary. Grabbing a purse is less intrusive than drawing a gun or handcuffing Askew-Bell or otherwise refusing her request to use the bathroom. Officer Mieszala was in a position where rapidly evolving events required him to make a quick decision based on his knowledge regarding the robberies, which were committed by threat of a gun, and Askew-Bell's suspicious behavior.

Askew-Bell relies on *Florida v. Royer* to argue that because Officer Mieszala seized Askew-Bell's purse and asked her to step away from the bathroom, the *Terry* stop escalated into a de facto arrest.[4] In *Royer*, a suspect who fit the so-called "drug courier profile" was approached by two detectives in an airport. *Royer*, 460 U.S. at 493-95. Upon request, the suspect produced his airline ticket and driver's license. Without

---

[4] Askew-Bell seems to be making the argument that the moment she was no longer free to leave, the encounter turned into an arrest. Def.'s Initial Mem. 7, & n.4; Def.'s Mem. 11. This is not the law. *See Florida v. Royer*, 460 U.S. 491, 498 (1983) ("[N]ot all seizures of the person must be justified by probable cause to arrest for a crime.") The issue is not whether Askew-Bell was seized, since the rule of *Terry* and its progeny is that an investigatory detention, defined as a brief seizure by police officers, is lawful if based on reasonable suspicion. Rather, the issue is whether the scope of that seizure transcended the bounds of its justification.

15

returning these items, the detectives asked the suspect to accompany them to a small police room. Without the suspect's consent, a detective retrieved the suspect's luggage (which the suspect had already checked) from the airline and brought it to the room. The suspect then consented to a search of his luggage, which produced marijuana. *Id.* (holding that detectives' actions turned the *Terry* stop into a de facto arrest because their conduct was more intrusive than necessary).

*Royer* does not stand for the proposition that any time an officer seizes a personal item during a *Terry* stop, such stop turns into a de facto arrest. The Supreme Court has asserted that "[g]iven the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 708-09 (1983). Rather, *Royer* stands for the proposition that when a detective's conduct is more intrusive "than necessary" to effectuate an investigative detention, such detention can amount to an arrest requiring probable cause.

In contrast to the officers' conduct in *Royer*, Officer Mieszala's conduct was reasonably related to the traditional "safety and security" justifications that afford officers the ability to search during a *Terry* stop: prevention of escape and diffusing a potentially dangerous situation.[5] *See Royer*, 460 U.S. at 504-05 (conduct found more intrusive than necessary where luggage seized by the officers in *Royer* had been checked by the suspect

---

[5] Another difference between *Royer* and the case at hand is that the suspect in *Royer* did not do anything to frustrate the *Terry* stop. Given the suspect's cooperation, the officer's investigation went beyond the scope of the circumstances that justified his initial stop. Here, Askew-Bell's conduct repeatedly escalated the encounter.

16

and was nowhere near him there was no reason to believe it needed to be searched to diffuse a dangerous situation).

### C. Officer Mieszala's Search of Askew-Bell's Purse and Wallet Did Not Violate the Fourth Amendment.

Having found that Officer Mieszala's actions up until this point were justified, the court turns to the question of whether the search of Askew-Bell's purse and wallet, after Askew-Bell fled from him and was apprehended by another officer, violated the Fourth Amendment. Based on two independent grounds, the court finds this search did not violate the Constitution.

#### 1. Askew-Bell Abandoned Her Purse and Wallet

As Officer Mieszala and Askew-Bell were walking to the front of the plaza so that Officer Mieszala could call a female officer to conduct a frisk, Askew-Bell turned and ran away from the officer and out a side emergency exit, thereby abandoning her purse. "Abandoned property is not subject to Fourth Amendment protection." *United States v. Basinski*, 226 F.3d 829, 837 (7th Cir. 2000) (quoting *Abel v. United States,* 362 U.S. 217, 241 (1960); *see United States v. McDonald,* 100 F.3d 1320, 1327 (7th Cir.1996). This is because Fourth Amendment protection extends only to places and items for which a person has a reasonable expectation of privacy, and no person can have a reasonable expectation of privacy in an item that he has abandoned. *Hester v. United States,* 265 U.S. 57, 58 (1924); *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996).

The test as to whether a defendant abandoned property is objective; it does not matter whether the defendant harbors a desire to later reclaim an item. The court must look "solely to the external manifestations of [defendant's] intent" as judged by a

reasonable person possessing the same knowledge available to the government agents. *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000).

In *Basinski*, the Seventh Circuit said a court should "look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property." 226 F.3d at 836-837 (citing *United States v. Chandler*, 197 F.3d 1198, 1200 (8th Cir. 1999)). The *Basinski* court explained that one type of abandonment case "is characterized by the presence of a fleeing defendant who relinquishes an object to make his flight easier or because discarding the item might make it easier for him to later claim that he never possessed it." *Id.* at 837 (citing *Hodari D.*, 499 U.S. at 624). Similarly, in *United States v. Morgan*, the Tenth Circuit explained that a defendant who, when asked to stop by the police, fled and threw his shoulder bag down on the side of a porch, thereafter walking back towards the police, had abandoned the bag and any privacy interest he had in it. 936 F.2d 1561, 1570 (10th Cir. 1991).

When Askew-Bell attempted to flee from Officer Mieszala without her purse, she abandoned it along with any privacy interest she had in it or its contents. Therefore, Officer Mieszala's search of the bag and the wallet within did not violate the Fourth Amendment.

   2. <u>The Search of the Purse and Wallet Was a Valid Search Incident to Arrest</u>

Additionally, when Askew-Bell turned and fled, Officer Mieszala's reasonable suspicion, which had already been increasing due to Askew-Bell's unusual behavior, ripened into probable cause to arrest her. A suspect's flight from an officer during a *Terry* stop may provide information to ripen an officer's preexisting suspicions into probable cause. *See Morgan*, 936 F.2d at 1569 ("Having already held Officer Eubanks

possessed the necessary reasonable suspicion to conduct the initial investigative stop and seizure, we now hold that the totality-of-the-circumstances–the facts establishing the officer's reasonable suspicion combined with the furtive actions and flight of [the suspect]–sufficiently support a finding of probable cause to arrest.") (citing *Kolender v. Lawson*, 461 U.S. 352, 366 n.4 (1983)); *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982) (suspect's own manifestation of guilt evidenced by flight from the agents back to the apartment transformed agents' reasonable suspicion into probable cause); *see also Tom v. Voida*, 963 F.2d 952, 960 (7th Cir. 1992) (upholding summary judgment on section 1983 claim on alternative grounds that furtive actions and flight gave officer probable cause to arrest the suspect).

Although he did not formally arrest her until he had searched her purse, because Officer Mieszala had probable cause to arrest Askew-Bell by the time he searched her purse and wallet, the search is a valid search incident to an arrest.[6] *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment").

### III. CONCLUSION

The court finds Officer Mieszala's actions, given the circumstances and the escalating situation with which he was faced, were reasonable. At each step, he tried to

---

[6] It can be argued that Officer Mieszala's search was also a valid search incident to the ongoing *Terry* stop. Though the usual rule is that searches incident to a *Terry* stop are limited to that required to diffuse the threat of arms or other dangerous objects, the Seventh Circuit has held that "an officer may check an individual's identification in his wallet during a *Terry* stop." *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004); *see also United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003) (pat-down search of passenger in stopped vehicle which resulted in seizure of $10,000 from passenger's breast pocket, as well as seizure of false identification and $1000 from passenger's wallet did not violate Fourth Amendment when money was visible to deputy and false identification came into plain view when deputy checked wallet for identification).

do the least intrusive thing he could think of but was frustrated by Askew-Bell's actions.

Askew-Bell's motion to suppress evidence is therefore denied.

ENTER:

　/s/_____
JOAN B. GOTTSCHALL
United States District Judge

Dated: April 2, 2007